# 14 CV 4290

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OKLAHOMA STEEL AND WIRE CO., INC., IOWA STEEL AND WIRE CO. and SOUTHWESTERN WIRE, INC., individually and on behalf of all those similarly situated, | Civil Action No. _____ |
| *Plaintiffs,* | **CLASS ACTION COMPLAINT** |
| vs. | **DEMAND FOR JURY TRIAL** |
| GLENCORE XSTRATA, PLC, GLENCORE LTD., PACORINI METALS AG, PACORINI METALS USA, LLC, TRAFIGURA BV, TRAFIGURA AG, NEMS (USA) INC., IMPALA UK LTD., IMPALA USA INC., THE GOLDMAN SACHS GROUP, INC., GOLDMAN SACHS INTERNATIONAL; GS POWER HOLDINGS LLC, METRO INTERNATIONAL TRADE SERVICES LLC, JPMORGAN CHASE & COMPANY, J.P. MORGAN VENTURES ENERGY CORPORATION, HENRY BATH & SON, LTD., HENRY BATH LLC, LONDON METAL EXCHANGE LIMITED, LME HOLDINGS LIMITED, HONG KONG EXCHANGES & CLEARING, LTD., and JOHN DOES 1-20, | |
| *Defendants.* | |


RECEIVED
JUN 13 2014
U.S.D.C. S.D. N.Y.
CASHIERS

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ....................................................................... 1

II.     PARTIES .................................................................................................... 4

        A.      Plaintiffs ........................................................................................ 4

        B.      Defendants ..................................................................................... 4

                1.      LME Defendants ................................................................. 4

                2.      Glencore Defendants.......................................................... 6

                3.      Trafigura Defendants ......................................................... 7

                4.      Goldman Defendants .......................................................... 9

                5.      JPMorgan Defendants ...................................................... 11

                6.      John Doe Defendants ........................................................ 12

III.    JURISDICTION, VENUE, AND COMMERCE ....................................... 13

IV.     CLASS ACTION ALLEGATIONS ........................................................... 14

V.      FACTUAL ALLEGATIONS ..................................................................... 16

        A.      Background on Zinc...................................................................... 16

        B.      The London Metal Exchange Controls Prices for Zinc and Oversees the Storage
                of the Metals .................................................................................. 17

        C.      The 2010 Takeover of Warehousing Companies by Banks and Traders............. 18

        D.      Defendants' Domination of the LME during the Class Period............................ 22

        E.      Conspiratorial and Anticompetitive Conduct ..................................................... 25

                1.      Manipulation of LME Rules ............................................. 25

                2.      Illicit Incentive Agreements............................................. 29

                3.      Glencore's Domination of the Zinc Market...................... 30

                4.      Market Allocation ............................................................. 32

                5.      Off Warrant Warehouses .................................................. 33

VI.     INVESTIGATIONS .................................................................................. 34

        A.      Government Investigations and the Sale of the LME............................. 34

VII.    ECONOMIC EVIDENCE SUGGESTS MANIPULATION .......................... 37

        A.      Price Effects .................................................................................. 37

        B.      Relevant Product Markets For Assessing Anticompetitive Effects........................ 44

VIII.   ANTITRUST INJURY AND STANDING ................................................. 45

IX.     CAUSES OF ACTION............................................................................... 45

X.      PRAYER FOR RELIEF ............................................................................ 50

XI.     DEMAND FOR JURY TRIAL .................................................................. 51

Plaintiffs Oklahoma Steel and Wire Co., Inc., Iowa Steel and Wire Co., and Southwestern Wire, Inc. ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action against Defendants as defined herein.   The following allegations are based on personal knowledge as to Plaintiffs' own conduct and are made on information and belief as to all other matters based on an investigation by counsel.[1]

## I.   NATURE OF THE ACTION

1.      In 2010, Defendants JPMorgan, Goldman, Glencore, and Trafigura (as defined in Section II(B), herein) purchased leading metals warehouse operators, collectively acquiring the majority of global metals warehousing authorized by the London Metal Exchange Ltd. ("LME") to store zinc and other commodity metals traded on the LME.   As detailed herein, these Defendants then conspired to manipulate global warehouse supplies of zinc through numerous anticompetitive means, all in concert with the LME—a purported private rulemaking and price setting organization—which Defendants used to their advantage.   By controlling flows of zinc into and out of LME warehouses, Defendants were able to control premiums charged for zinc in the entire relevant market.   Moreover, as detailed below, Defendants were well represented on numerous LME Committees, including the Executive Committee,[2] the Lead and Zinc Committee,[3] and the Warehousing Committee,[4] throughout the Class Period (defined below),

---

[1] Counsel's investigation includes an analysis of zinc and zinc premium pricing information, publicly available market information, news articles, statements made during Congressional hearings on the manipulation of the metals market, and additional analysis.

[2] LME's Executive Committee is responsible for the management of LME's operations including, among other things, "reviewing and approving the listing and delisting of warehouses."  See, http://www.lme.com/en-gb/about-us/corporate-structure/committees/ (last visited June 12, 2014).

[3] LME's Lead and Zinc Committee is responsible for, among other things, "responding to Warehousing Committee consultations regarding various warehousing matters" and "recommending the addition or deletion of good delivery points" for zinc.  See http://www.lme.com/en-gb/about-us/corporate-structure/committees/ (last visited June 12, 2014).

giving the Defendants the opportunity to manipulate LME rules in furtherance of their anticompetitive scheme.

2.      Metals warehouses are "a crucial bridge between physical and financial markets."[5] The critical nature of LME warehouses provided Defendants with ample motive to monopolize and otherwise restrain trade in zinc warehousing to profit not only by creating artificial queues for zinc in LME warehouses, thereby earning inflated warehousing rents, but also in their trading of financial instruments based on zinc prices (such as zinc futures). LME warehouses in and around New Orleans, Louisiana, which are controlled principally by Defendant Glencore through its warehousing affiliate Pacorini house the majority of zinc available in the United States. Other LME warehouses controlled by the Defendants also store zinc.

3.      Restricting the amount of zinc exiting LME warehouses benefits Defendants by, *inter alia*, allowing several Defendants (as LME warehouse owners) to charge storage fees (rents) over a longer period of time as the zinc waits to be shipped out, artificially driving up the cumulative storage costs. These artificial storage costs influence zinc premiums paid by Plaintiffs and the Class as the premiums are intended to reflect the logistical cost of storing and moving metal from LME warehouses.

4.      Zinc premiums, such as the Platts Zinc Special High Grade Premium ("MW SHG" or "Platts zinc premium"), which historically have been intended to reflect the total logistical cost of delivering metals, play a critical role in determining the price of zinc for

---

[4] LME's Warehousing Committee makes recommendations on warehousing-related policy issues, plays a role in developing the rules and regulations governing the warehouses, and advises the executive committee. *See* http://www.lme.com/en-gb/about-us/corporate-structure/committees/ (last visited June 12, 2014).

[5] *Metals warehouse mess: a guide for the perplexed,* REUTERS (Aug. 16, 2013), http://www.metal.com/newscontent/52150_metals-warehouse-mess-a-guide-for-the-perplexed (last visited June 12, 2014).

physical delivery as purchasers pay the underlying "spot" price of the metal **and** the associated premiums in the purchase price.

5.     The historical relationship between zinc premiums and the cost of delivery has been eroded by Defendants' conduct during the Class Period, and zinc premiums are now inflated by artificial LME warehouse delays created by the Defendants' anticompetitive conduct. For example, it has been reported that "Glencore, which controls 60 percent of the world's zinc trade, is using warehouses monitored by the London Metal Exchange (LME) to stow away the metal and support premiums."[6]

6.     Defendants' conspiracy to monopolize and restrain trade in zinc stored in LME warehouses directly caused anticompetitive price effects in the markets for the sale of zinc globally and in the United States in violation of Sections 1 & 2 of the Sherman Antitrust Act and Sections 4 and 16 of the Clayton Antitrust Act.

7.     From at least May 24, 2010 to the present (the "Class Period"), Defendants have injured purchasers of zinc for physical delivery globally and in the United States, such as Plaintiffs, by unlawfully conspiring to restrain supplies and inflate relevant premiums associated with the purchase of zinc.  Defendants used a number of anticompetitive means to accomplish their goal, including: conspiring with the LME to manipulate LME rules to ensure artificial metals queues and resisting reforms to those rules; making incentive arrangements to hoard zinc and other metals warehoused with zinc; allocating and dividing warehousing capacity; and engaging in shadow warehousing—taking zinc out of the LME system—to manipulate perceived supply and thus the prices for physical delivery of zinc paid by Plaintiffs and members of the Class.

---

[6] Angel, Maytall, *RPT-Glencore tightens grip on global zinc market*, REUTERS (May 17, 2012), http://www.reuters.com/article/2012/05/17/glencore-zinc-idUSL5E8GGJYL20120517 (last visited June 12, 2014).

## II.     PARTIES

### A.     Plaintiffs

8.      Plaintiff Oklahoma Steel and Wire Co., Inc. ("Oklahoma Steel") is an Oklahoma corporation located at 799 Highway 70 South, Madill, Oklahoma 73446.   Oklahoma Steel purchased zinc for physical delivery during the Class Period for use in producing galvanized steel and wire products.  Plaintiff was injured as a result of the scheme set forth herein.

9.      Plaintiff Iowa Steel and Wire Co. ("Iowa Steel") is an Iowa corporation located at 1500 W. Van Buren, Centerville, Iowa 52544.  Iowa Steel purchased zinc for physical delivery during the Class Period for use in producing galvanized steel and wire products.  Plaintiff was injured as a result of the scheme set forth herein.

10.      Plaintiff Southwestern Wire, Inc. ("Southwestern Wire") is an Oklahoma corporation located at 3505 N. Interstate Drive, Norman, Oklahoma 73069.  Southwestern Wire purchased zinc for physical delivery during the Class Period for use in producing a variety of galvanized wire products.  Plaintiff was injured as a result of the scheme set forth herein.

### B.     Defendants

#### 1.     LME Defendants

11.      Defendant London Metal Exchange Ltd. ("LME") is located at 56 Leadenhall Street, London EC3A 2DX, United Kingdom and does business in the United States and in this District by, among other things, promoting its exchange among U.S. market participants including through business meetings and also through the warehousing activities alleged herein, and licensing of warehouses in the U.S.  According to the LME's website, "[the LME] is the world centre for industrial metals trading and price-risk management."

4

12.     More than 80% of global non-ferrous business is conducted through the LME and the prices discovered on its trading platforms are used as the global benchmark.[7]   Among its various functions, the LME maintains a large network of storage units for its traded commodities, such as zinc.   LME approved warehouses are located across the United States and throughout the world.

13.     There are five categories of LME membership.   The most significant and powerful (Category 1 or "ring dealing") consists primarily of investment banks – including JP Morgan.   Known as members of the open-cry "Ring," they have full trading privileges.   Category 2 - Associated broker clearing members - include other banks, like Goldman Sachs.   They have all the privileges of Category 1 ring dealing members, except that they may not openly trade in the Ring, operating instead through the 24 hour inter-office market, or the clearing house. Category 3, Associate broker members, may issue LME contracts, but are not members of the clearing house, nor may they trade in the Ring.   They operate through the 24 hour inter-office market.   Category 5 members are primarily mining companies, including Glencore.

14.     Defendant LME Holdings Limited ("LME Holdings") is a corporation that, until December 6, 2012, was the corporate parent of the LME.   On December 6, 2012, the LME was acquired by Hong Kong Exchanges & Clearing, Ltd.   LME Holdings is an intermediate corporate entity between Hong Kong Exchanges & Clearing, Ltd. and the LME.

15.     Defendant Hong Kong Exchanges & Clearing, Ltd.   ("HKEx") is a Hong Kong corporation headquartered in Hong Kong.   It presently owns, operates, and controls the LME. HKEx is located at One International Finance Centre, 1 Harbour View Street, Central, Hong Kong.

---

[7] *See* LME Website, http://www.lme.com/ (last visited June 12, 2014).

16.     HKEx does business in the United States and in this District by, among other things, promoting its exchange among U.S. market participants including through business meetings and also through the warehousing activities alleged herein, and licensing of warehouses in the U.S. through the LME.  The LME and HKEx have constant contact with the United States and will soon have a permanent physical presence.  LME management makes frequent trips to the United States and it has a constant interface with U.S. regulators.

17.     The LME, LME Holdings, and HKEx are referred to herein collectively as the "LME."

## 2.     Glencore Defendants

18.     Defendant Glencore Xstrata plc is a public limited company organized under the laws of the United Kingdom and headquartered at Baarermattstrasse 3, CH-6340 Baar, Switzerland.  The company is an integrated producer and marketer of commodities, including metals and minerals such as zinc.  The company has interests in controlled and non-controlled industrial assets including mining, smelting, refining, and warehousing operations.  According to its 2013 Annual Report, Glencore Xstrata plc's metals and minerals business segment is responsible for managing hedging and industrial investment activities relating to metals and minerals including zinc.

19.     Defendant Glencore Ltd. is a public limited company organized under the laws of the United Kingdom that resides at 301 Tresser Boulevard, Stamford, CT, 06901.  Javier Suarez of Glencore International, AG is a member of the LME Lead and Zinc Committee.  Glencore UK Ltd, a subsidiary of Glencore International, AG, is a Category 5 (Associate Trade) member of the LME.

20.     Defendant Pacorini Metals AG ("PMAG"), whose principal place of business is located in Zug, Switzerland, and which is owned and controlled by Glencore, is a leading

provider of LME-certified warehousing throughout the world, including the United States, where it operates through its wholly-owned subsidiary, Defendant Pacorini Metals USA LLC ("PMUSA," collectively with PMAG, "Pacorini").

21.     Defendant PMUSA is a limited liability company organized under the laws of Delaware and headquartered at 220 Broening Highway, Baltimore, Maryland 21224.

22.     Glencore Xstrata plc, Glencore International plc, Glencore Ltd and Pacorini are referred to herein collectively as "Glencore."

23.     Glencore itself and/or by and through wholly owned and controlled subsidiaries, transacts in physical zinc, as well as financial instruments tied to zinc, and warehoused physical zinc, and did so during the entire Class Period.

24.     In a prospectus for its initial public offering, Glencore estimated that in 2010 it held 60% of the addressable markets for zinc.[8]

25.     During the Class Period, Glencore had a dominant position in LME warehousing in New Orleans, LA, particularly in the warehousing of LME zinc.

26.     Glencore was and is a member of the unlawful combination and conspiracy alleged herein.

### 3.     Trafigura Defendants

27.     Defendant Trafigura Beheer BV ("Trafigura") is located at Gustav Mahlerplein 102, 20th Floor, Ito Tower, 1082 MA Amsterdam, The Netherlands.

28.     Trafigura occupies a pivotal position in the global commodities market balancing the supply and demand for raw materials that are essential to the global market. According to Trafigura, its "production, storage, warehousing and distribution networks bring profitable

---

[8] Burton, Mark, *Trafigura reveals financial data, trading volumes in bond prospectus*, Metal Bulletin, April 23, 2013.

opportunities. [It] both lease[s] and acquire[s] assets in support of [its] core business: trading." Trafigura Beheer BV wholly owns Defendants North European Marine Services, Ltd., which in turn wholly owns NEMS (USA) Inc. ("NEMS"), an LME-approved US-based warehousing company.

29.     Through its NEMS subsidiary (now subsumed under its terminal operator subsidiary), Trafigura owns LME-licensed warehouses in the U.S. in Baltimore, Maryland; New Orleans, Louisiana; Henderson, Kentucky and has offices in Chicago, Illinois.

30.     Defendant NEMS was an LME-approved warehousing company and wholly owned subsidiary of North European Marine Services, Ltd., which was a wholly-owned subsidiary of Trafigura.  NEMS is located at 301 Tresser Boulevard, Stamford Connecticut 06901.

31.     Impala USA Inc. and Impala UK Ltd. ("Impala") are wholly owned subsidiaries of Trafigura that operate global metals terminals.

32.     In January 2014, it was announced that NEMS would be fully integrated into Impala and the NEMS name retired.

33.     Defendants Defendant Trafigura BV, Trafigura AG, Impala, and NEMS, are collectively referred to herein as "Trafigura."

34.     Trafigura, itself and/or by and through wholly owned and controlled subsidiaries, transacts in physical zinc, as well as financial instruments tied to zinc, and warehoused physical zinc, and did so during the entire Class Period.

35.     During the Class Period, Trafigura had a dominant position in LME warehousing in Antwerp, Belgium.

36.     Trafigura has stated that it believes "it is the second-largest independent trader of non-ferrous metals and minerals in the 'tradable market' for copper, lead and zinc metal."[9]

37.     Trafigura was and is a member of the unlawful combination and conspiracy alleged herein.

### 4.     Goldman Defendants

38.     Defendant The Goldman Sachs Group Inc. ("Goldman Sachs") is a Delaware corporation headquartered at 200 West Street, New York, New York 10282.  It is a leading global investment banking, securities, and investment management firm that provides a wide range of financial services to a substantial client base.

39.     Defendant Goldman Sachs International ("GSI") is a bank holding company and a financial holding company regulated by the Board of Governors of the Federal Reserve System. It is also a leading global investment banking, securities and investment management firm that provides financial services to corporations, financial institutions, governments and, high-net-worth individuals.

40.     Defendant GS Power Holdings LLC ("GS Power Holdings") is a wholly-owned subsidiary of Goldman Sachs.  It is a Delaware limited liability company located at 85 Broad Street, New York, New York 10004.

41.     Defendant MCEPF Metro I, Inc. ("MCEPF Metro I") is a wholly-owned subsidiary of Goldman Sachs.  It is a Delaware corporation with a registered address of 160 Greentree Drive, Suite 101, Dover, Delaware 19904.

42.     Defendant Mitsi Holdings LLC ("Mitsi") is a Delaware limited liability corporation located at 39533 Woodward Avenue, Suite 170, Bloomfield Hills, Michigan 48304.

---

[9] Burton, Mark, *Trafigura reveals financial data, trading volumes in bond prospectus*, Metal Bulletin, April 26, 2013.

It is co-owned by GS Power Holdings and MCEPF Metro I, each of which is wholly-owned by Goldman Sachs.

43.     Defendant Metro International Trade Services LLC ("Metro International") is a Delaware limited liability corporation with a registered address at 39533 Woodward Avenue, Suite 170, Bloomfield Hills, Michigan 48304. Its headquarters are located at 6850 Middlebelt Road, Romulus, Michigan 48174. Metro International is owned directly by Mitsi and operates as a subsidiary of Goldman Sachs, which owns Mitsi through its ownership of GS Power Holdings and MCEPF Metro I, each of which is wholly-owned by Goldman Sachs.

44.     Metro International is a global warehouse operator, specializing in the storage of non-ferrous metals for the LME.  Metro International is an LME-approved warehouse.  Metro International was acquired by Goldman in February 2010.  As of March 8, 2013, Goldman, through Metro International, owned and operated 29 out of a total of 37 LME-listed storage facilities.  Metro International also has a seat on the LME's Warehousing Committee, which makes recommendations on warehousing-related policy issues, plays a role in developing the rules and regulations governing the warehouses, and advises the executive committee.[10] Goldman Sachs, GS Power Holdings, GSI, MCEPF Metro I, Mitsi, and Metro International are referred to herein as "Goldman."

45.     Goldman, itself and/or by and through wholly owned and controlled subsidiaries, traded extensively in commodities, including zinc, on the LME and was a shareholder of LME Holdings.  Stephen Branton-Speak of Goldman served on the LME Executive Committee during the Class Period.

---

[10] References to the membership and governing rules of the LME Warehousing Committee have been removed from the LME website as of April 2014.

46.   Goldman was and is a member of the unlawful combination and conspiracy alleged herein.

47.   Goldman was one of the largest shareholders of the LME prior to the HKEx acquisition.

### 5.   JPMorgan Defendants

48.   Defendant JPMorgan Chase & Co. ("JPMorgan") is an investment bank and financial services firm incorporated in Delaware with its principal place of business at 270 Park Ave., New York, New York.  In February 2010, JPMorgan acquired Henry Bath & Son Ltd., a UK based metals warehousing company.

49.   Defendant JPMorgan Securities plc is a Category 1 ring dealing member of the LME.

50.   Defendant JPMorgan Ventures Energy Corporation is the bank's commodity division, incorporated in Delaware, that acquired Henry Bath & Son, Ltd.'s network of metals warehouses as part of the purchase of the commodities business of RBS Sempra in 2010 for approximately $1.6 billion.  JPMorgan, JPMorgan Securities plc and JPMorgan Ventures Energy Corporation are referred to herein as the "JPMorgan Defendants."

51.   Defendant Henry Bath & Son, Ltd. is a London-based company that stores and ships metal around the world.  It is a corporate parent of defendant Henry Bath LLC, and is headquartered at 12 Princes Parade, St. Nicholas Place, Liverpool L3 1 BG, United Kingdom.

52.   Defendant Henry Bath LLC is organized under the laws of Delaware, has its principal place of business at 2500-A Broening Highway, Baltimore, Maryland, and is a subsidiary of Henry Bath & Son, Ltd.  Henry Bath & Son, Ltd. and Henry Bath LLC are referred to herein as "Henry Bath."

11

53.   The JPMorgan Defendants and Henry Bath are referred to herein collectively as "JPMorgan."

54.   JPMorgan's commodities trading business is primarily under its Corporate and Investment Bank umbrella.  JPMorgan itself and/or by and through wholly owned and controlled subsidiaries, transacts in physical zinc, as well as financial instruments tied to zinc, and warehoused physical zinc, during the Class Period.

55.   The London agent for all Henry Bath Group companies is International Commodity Services Limited ("ICS").  ICS Chairman Mike Dudley is a member of the LME Warehousing Committee.  Additionally, Graham Hawkins, Group General Manager of Henry Bath & Son Ltd. (a subsidiary of J.P. Morgan Ventures Energy Corporation, which itself is a subsidiary of JPMorgan Chase & Co.) and a former Executive Director at a JPMorgan entity, is a member of the LME Warehousing Committee.

56.   During the Class Period, JPMorgan had a dominant position in LME warehousing in Baltimore, Maryland, where it warehoused physical aluminum, lead, and zinc, among other metals.  JPMorgan owns and operates LME-approved metal storage networks, including in the United States, the United Kingdom, Singapore and the Netherlands with United States locations in Baltimore, Chicago and New Orleans.

57.   JPMorgan was and is a member of the unlawful combination and conspiracy alleged herein.

58.   JPMorgan was one of the largest shareholders of the LME prior to the HKEx acquisition and remains a shareholder of the LME.

### 6.   John Doe Defendants

59.   The John Doe Defendants 1-20 are other persons who have engaged in the agreements alleged herein, including warehouse owners situated similarly to the Defendants.

12

60.     Other entities and individuals unknown to Plaintiffs at this time participated as co-conspirators and performed acts in furtherance of the conspiracy.  Whenever reference is made to any act, deed, or transaction of any corporation or partnership, the allegation means that the corporation or partnership engaged in the act, deed or transaction by or through its officers, directors, agents, employees, representatives, parent, predecessors or successors-in-interest while they were actually engaged in the management, direction, control or transaction of business or affairs of the corporation or partnership.

## III.    JURISDICTION, VENUE, AND COMMERCE

61.     This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332(d), and 1337.

62.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. § 1391(b), (c) and (d), because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

63.     Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States, including in this District.

64.     During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate railroads, highways, waterways, airways, wires, wireless spectrum, and the U.S. mail, to effectuate their illegal scheme.

65.     Defendants' manipulation, conspiracy and conduct alleged herein was in U.S. import commerce and/or had direct, substantial and reasonably foreseeable effects on U.S. domestic commerce, within the meaning of the Foreign Trade Antitrust Improvements Act.

13

66.     Defendants' conduct had a substantial effect on the intrastate commerce of each of the fifty United States and its territories.

67.     This Court has personal jurisdiction over each Defendant, because each Defendant transacted business, maintained substantial contacts, is located and/or they or their coconspirators committed overt acts in furtherance of their illegal conspiracy, in the United States, including in this District.  The scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this District.

## IV.    CLASS ACTION ALLEGATIONS

68.     Plaintiffs brings this action on behalf of themselves and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of a Class defined as follows:

> All persons or entities that purchased zinc for physical delivery in the United States pursuant to a contract that includes a price term based on the Platts zinc premium or related market premium from May 24, 2010 to the present (the "Class").

69.     The Class excludes the Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

70.     Members of the Class are so numerous and geographically dispersed that joinder is impracticable.  Further, the Class is readily identifiable from information and records in the possession of Defendants.

71.     Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and members of the Class were damaged by the same wrongful conduct of Defendants.

72.     Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiffs are coincident with, and not antagonistic to, those of the Class.

14

73.     Plaintiffs are represented by counsel with experience in the prosecution of class action antitrust litigation.

74.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to the Class as a whole appropriate.  Questions of law and fact common to the Class include, but are not limited to the:

      a.   Existence of the conspiracy;

      b.   Scope of conspiracy;

      c.   Length of the conspiracy;

      d.   Damages resulting from the conspiracy;

      e.   Unjust enrichment of Defendants; and

      f.   Whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

75.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort or expense that numerous individual actions would require.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

76.     Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## V.     FACTUAL ALLEGATIONS

77.     Beginning in 2010, Goldman, JPMorgan, Glencore and Trafigura began acquiring warehousing companies in the LME system which gave these Defendants dominance over zinc storage in several strategic locations worldwide.

78.     Following the acquisitions, consumers of LME stored metals began to complain about storage costs and significant delays in obtaining physical delivery of metals from LME-certified warehouses.[11]  Defendants went so far as to pay incentives to producers to attract metal into the warehouses which caused significant delays.  The longer LME metals, such as zinc, are stored in LME warehouses the more daily storage fees warehouse owners charge.

79.     Storage costs (rents), which are supported by incentive payments, have a significant influence on the premium added to the price of zinc.  As with other metals sold on the spot market, delays in extracting zinc from LME warehouses results in higher prices for all zinc customers as the increased costs are incorporated into premiums related to the metals[12].

### A.     Background on Zinc

80.     As reported by the U.S. Geological Survey ("USGS"), "Zinc is the 23rd most abundant element in the earth's crust.  Sphalerite, zinc sulfide, is and has been the principal ore mineral in the world. Zinc is necessary to modern living, and, in tonnage produced, stands fourth among all metals in world production - being exceeded only by iron, aluminum, and copper. Zinc uses range from metal products to rubber and medicines."[13]

---

[11] *See* David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, THE NEW YORK TIMES (July 20, 2013), http://www.nytimes.com/2013/07/21/business/a-shuffle-of-aluminum-but-to-banks-pure-gold.html?_r=0 (last visited June 12, 2014) (the "NYTimes Report").

[12] *Id.*

[13] *See* http://minerals.usgs.gov/minerals/pubs/commodity/zinc/ (last visited June 12, 2014).

81.     About 12 million tons of zinc are produced annually worldwide.  More than half of this amount is used for galvanizing to protect steel and other metals from corrosion. Approximately 14% goes into the production of zinc base alloys, mainly to supply the die casting industry and 10% to produce brass and bronze. Significant amounts are also utilized in rolled zinc applications including roofing, gutters and down-pipes. The remainder is consumed in compounds such as zinc oxide and zinc sulfate.[14]

**B.     The London Metal Exchange Controls Prices for Zinc and Oversees the Storage of the Metals**

82.     The "LME is the de facto price formation venue for base metals"[15] such as zinc. LME prices "are used the world over by industrial and financial participants for purposes of referencing, hedging, physical settlement, contract negotiations and margining and are indicators of where the market is at any point in time."[16]  "The LME Official Price is used as the global benchmark for physical contracts of zinc. The LME Official Settlement Price is the price at which all LME futures are settled.[17]

83.     Zinc prices are arrived at through a live open-outcry process in London in what is call the Ring.  JPMorgan is a ring dealing member of the LME.

84.     The LME claims that "[p]rice convergence is another very important feature of the LME and its operations.  The LME licenses warehouses to provide a market of last resort and to ensure the LME price stays in line with the physical/spot price. The underlying threat of the delivery of physical material - made possible by the network of LME-approved warehouses - is

---

[14] *See* http://www.zinc.org/basics/zinc_uses (last visited June 12, 2014).

[15]*See* http://www.lme.com/pricing-and-data/pricing/price-discovery/ (last visited June 12, 2014).

[16] *See* http://www.lme.com/pricing-and-data/pricing/price-discovery/ (last visited June 12, 2014).

[17] *See* http://www.lme.com/pricing-and-data/pricing/official-price/ (last visited June 12, 2014).

what keeps the LME price in line with the physical price. This price convergence, coupled with unprecedented global volumes, means the prices discovered on the LME's markets are used across the world as benchmarks in all sectors of the metals value chain."[18]

### C.   The 2010 Takeover of Warehousing Companies by Banks and Traders

85.     Beginning in early 2010, Glencore, Trafigura, Goldman, and JPMorgan each purchased a significant number of LME warehouses, becoming "landlords to about two-thirds of the LME's entire metal stock"[19] in less than a year.  Specifically, in a February 2010 deal, JPMorgan acquired Henry Bath as part of a larger transaction in which it bought a significant portion of RBS Sempra Commodities' business for approximately $1.6 billion.[20]  Three days later, Goldman announced that it was acquiring Metro in a deal purportedly worth $550 million.[21]   Trafigura bought NEMS in March 2010.[22]  Glencore then bought the metals warehousing assets of Pacorini for $209 million in September 2010.[23]  The acquisitions not only gave Defendants the ability to control a critical component in the distribution of physical zinc, it also gave each of them a voice in constructing LME policy via their involvement in various LME

---

[18] *See* http://www.lme.com/pricing-and-data/pricing/convergence/ (last visited June 12, 2014).

[19] *See* Carolyn Cui & Tatyana Shumsky, *Commodities Beckon Banks: Resource Storage Gives Lenders Profits in Tough Times, but Some Clients Complain of Bottlenecks*, THE WALL STREET JOURNAL (July 5, 2011), http://online.wsj.com/news/articles/SB10001424052702304803104576426131256469252 (last visited June 12, 2014).

[20] *See* Javier Blas, *Goldman and JPMorgan enter metal warehousing*, FINANCIAL TIMES (March 2, 2010), http://www.ft.com/intl/cms/s/0/5025f82a-262e-11df-aff3-00144feabdc0.html#axzz2s0rTmNQn. (last visited June 12, 2014).

[21] *Id.*

[22] *See, Trafigura buys metals warehousing company NEMS Ltd*, REUTERS, (Mar. 1, 2010), http://www.reuters.com/article/2010/03/01/metals-warehouse-trafigura-idUSLDE6200Q620100301 (last visited June 12, 2014).

[23] *See* Maytaal Angel, *Banks outsmart metals storage rules to make millions*, REUTERS (Feb. 6, 2012), http://www.reuters.com/article/2012/02/06/lme-warehouses-idUSL5E8D62DU20120206. (last visited June 12, 2014).

Committees.[24]  Moreover, as owners of LME warehouses Defendants were able to earn profits by charging daily rents for metals stored in their respective warehouses.  A portion of the rent was remitted to the LME.

86.    In terms of zinc stockpiles in the LME system, Pacorini's assets acquired by Glencore included the majority of LME warehouses in and around New Orleans.  The New Orleans area warehouses held "55% of all LME zinc."[25]  Goldman, JPMorgan and Trafigura collectively acquired nearly all of the remaining zinc warehousing facilities in New Orleans.

87.    In advance of the acquisition, during the time when Glencore was rumored to be in talks to acquire Pacorini (and was thus likely actively negotiating) premiums for zinc rose "amid speculation that material landing in New Orleans warehouses is being locked up [by Glencore] in long-term financing deals" due to "favorable rental deals by the warehouses."[26]

88.    Within a week of Glencore's announcement that it was taking over Pacorini, warrants for more than 50,000 tons of zinc in New Orleans warehouses were canceled in a single day.  "To have (59,000 tonnes) canceled on the same day is not how the industry works. This is a trader. Everybody isn't going to call on one day."[27]  "It might be a strategic trading ploy on behalf of a certain trader to ramp up premiums in the region by giving the impression of increased demand."[28]  As another source stated, "It's not a coincidence that one day we hear

---

[24]  *See London Metal Exchange: Warehousing Committee*, LONDON METAL EXCHANGE, http://www.lme.com/about-us/corporate-structure/committees/warehousing-committee/ (last visited June 12 2014) (references to the Warehousing Committee have been removed from the LME website as of April 2014 as discussed herein).

[25] Janie Davies, *Base metals lose early gains on Euro news*, Metal Bulletin (May 25, 2010).

[26] Tom Jennemann, *US zinc premiums on the rise*, Metal Bulletin (June 8, 2010).

[27] Tatyana Shumsky, *Zinc heading to off-exchange storage*, Metal Bulletin (Aug. 10, 2010).

[28] *Id.*

Glencore just bought Pacorini and a few days later (59,000) tonnes is canceled.  That would strike me as more than slightly suspicious."[29]

89.    By at least the start of the Class Period, Defendants: owned the largest share of LME warehouses in the world; controlled zinc warehousing in New Orleans; were on the rules committee for recommending storage fees and minimum delivery requirements for those warehouses; benefitted from rents generated by increasing queues; and traded in zinc as well as financial instruments tied to the price of zinc.  This, combined with their substantial ownership stakes in the LME, enabled the Defendants to conspire with each other to manipulate the LME warehousing system and its rules to, *inter alia*, maximize profits from rental income and trading.

90.    Moreover, "[b]y controlling warehouses, pipelines and ports, banks gain valuable market intelligence, investment analysts say.  That, in turn, can give them an edge when trading commodities."[30]  As was testified to in a Congressional Hearing on the matter:

> Goldman is one of the largest traders of derivatives in the metals markets.  Unlike an independent warehouse operator, Goldman can potentially use its storage capabilities not only to generate rental income but also to move commodity prices in a way that would benefit its derivatives positions. . . .  As one of the world's biggest dealers in commodity derivatives, Goldman can devise and execute highly sophisticated trading strategies across multiple markets.  The ability to influence prices of physical assets underlying derivatives, in effect, completes the circle.  It makes Goldman's derivatives profits not so much a function of its traders' superior skills or executives' talents, but primarily a function of the firm's structural market power.[31]

91.    Likewise, there are similar questions concerning "risks to the financial system by [JPMorgan's] ownership of warehouses and plants and whether [JPMorgan's] holdings of these

---

[29] *Id.*

[30] *See* NYTimes Report.

[31] Large U.S. Banking Organizations' Activities in Physical Commodity and Energy Markets: Legal and Policy Considerations: Hearing Before the S. Comm. on Banking, Housing, & Urban Affairs, Subcommittee on Fin. Insts. & Consumer Prot. 113th Cong. 22 (2013) (statement of Saule T. Omarova, Associate Professor of Law, University of North Carolina at Chapel Hill) ("Omarova Testimony").

assets constitutes a concentration of market power that has increased bank profits at the expense of consumers."[32] "By controlling warehouses, pipelines and ports, banks gain valuable market intelligence, investment analysts say. That, in turn, can give them an edge when trading commodities."[33]

92.    Indeed, on the day JPMorgan entered the warehousing business, Blythe Masters, the head of Defendant JPMorgan's commodities business, stated, "[j]ust being able to trade financial commodities is a serious limitation because financial commodities represent only a tiny fraction of the reality of the real commodity exposure picture" and admitted JPMorgan purchased commodities assets including the LME warehouses "in order to understand and *make* prices."[34]

93.    Glencore's CEO recently remarked: "'We're different from our peers. We have the trading part of the business [...] it gives us an edge on our competitors.' It is the trading business that allows the company to have such a close eye on commodity prices."[35] "Their knowledge of the flow of commodities around the world is truly frightening," says an outsider who has worked closely with senior Glencore officials and who, like most people interviewed by Reuters for this report, declined to be identified speaking about the company for fear it could jeopardize sensitive business relationships."[36]

---

[32] *See* Christian Berthelsen, *Senate Panel Opens Probe of Banks' Commodities Businesses; Information Requested From J.P. Morgan Chase, Goldman Sachs and Morgan Stanley*, THE WALL STREET JOURNAL (July 30, 2013), http://online.wsj.com/news/articles/SB10001424127887324170004578638032972615060 (last visited June 12, 2014).

[33] NYTimes Report.

[34] Gregory Meyer, *Wall St. falls out of love with commodities trading*, FINANCIAL TIMES (August 4, 2013), http://www.ft.com/intl/cms/s/0/4d1f8f7a-faf0-11e2-87b9-00144feabdc0.html?siteedition=intl#axzz2iYN8yxMa. (last visited June 12, 2014).

[35] Claire Hack, *Glasenberg talks base metals in Glencore results call*, Metal Bulletin (March 10, 2014).

[36] *See* Eric Onstad, *The biggest company you've never heard of*, REUTERS NEWS (Feb. 25, 2011).

### D.      Defendants' domination of the LME during the Class Period

94.      Defendants owned and controlled the LME prior to its acquisition by HKEx. Before the sale, Goldman Sachs owned approximately 9.5% of the LME and JPMorgan owned approximately 11%.  In addition, JPMorgan is a Category 1 (Ring Dealing) member of the LME. Goldman is a Category 2 member, and Glencore is a Category 5 member. Although HKEx has taken over primary ownership, Defendants' executives remain in important decision-making positions, as they had prior to the sale, including:

- Glencore's Javier Suarez is a member of the LME Lead and Zinc Committee;

- Goldman's Stephen Branton-Speak served on the LME Executive Committee;

- Metro's Chris Wibbleman is a member of the LME Warehousing Committee;

- Henry Bath's ICS Chairman Mike Dudley is a member of the LME Warehousing Committee; and

- Graham Hawkins, Group General Manager of Henry Bath and a former Executive Director at a JPMorgan entity, is a member of the LME Warehousing Committee;

- Marc Waszkis, the Chief Executive Officer of Pacorini Metals AG (which itself is part of the Pacorini Metals Group) is a member of the LME Warehousing Committee;

- Christian Schirmeister of JP Morgan is the Chairman of the LME Copper Committee;

- George Donoghue of J.P. Morgan Metals Limited is a member of the LME Tin Committee;

- Andrew Caplan, the Head of the Aluminum Division of Glencore International AG (which is a subsidiary of Glencore Xstrata PLC), is a member of the LME Aluminum Committee;

- Michael Lockwood of Xstrata Copper Middle East, DMCC (a Glencore affiliate) serves on the LME Copper Committee;

95.      The relationships between Goldman, JPMorgan, Glencore and the LME are illustrated in the three charts below:

## Goldman



## JPMorgan





### Glencore



96.     The Defendants' influence over the LME and its various committees is significant because the LME establishes rules for the warehousing of exchange traded metals, including zinc and other metals traded through the LME.  The rules for LME regulated warehouses, such as Metro, Henry Bath, NEMS, Impala and Pacorini were influenced by interested parties such as Goldman, JPMorgan, Glencore and Trafigura (and the LME warehouses themselves), who sat on various LME Committees, including the Executive Committee, Aluminium [sic] Committee, Lead and Zinc Committee, Copper Committee, Tin Committee and Warehousing Committee, which were responsible for, *inter alia*, making warehousing-related policy recommendations to the LME.

97.     Through Defendants' ownership of—and rulemaking role in—the LME, Defendants have been able to control the supply of zinc, which in turn dictates the price, in particular the premiums imposed on zinc sales in the United States.  By controlling the LME, defendants control the warehousing rules of the LME, including as discussed below, the

24

minimum load-out rules, the maximum rental rate for storage and who can own warehouses. Further, Defendants' role in the commodities market as traders (on their own behalf and on behalf of clients) allows them to reap additional profits and control and "make" prices.

### E.   Conspiratorial and anticompetitive conduct

#### 1.   Manipulation of LME rules

98.    Defendants took specific steps to artificially restrict the supply of zinc entering the market as their stockpiles increased.

99.    Zinc stored in LME warehouses are held under warrants—the LME's record of ownership.  When a warrant is "cancelled" (metal is to be removed from the LME warehouse) the cancelled metal is added to the load-out queue but the owner continues to pay daily rent to the warehouse (owned by Defendants) until the metal exits the facility.  Because cancelled warrants on zinc have consistently exceeded the daily load-out rate throughout the Class Period (and beyond) as a result of the Defendants' manipulations, the queue for zinc at critical locations has correspondingly grown, increasing the rents paid and artificially inflating premiums paid by Plaintiffs and members of the Class.

100.    Goldman, JPMorgan, Trafigura and Glencore, as members of the LME Warehousing Committee and owners of the LME, maintained an agreement that required a minimum of 1,500 tons (later increased to 3,000) of metal per city to be released each day.

101.    The minimum release requirement purportedly was put in place to satisfy purchaser demand.  However, implicit in the shipping requirements was an agreement that (i) the "minimum" could readily be treated as a maximum with no penalty, (ii) the "minimum" applied to an entire city (i.e., no percentage-per-warehouse shipment was required)—allowing the Defendants to take advantage of the massive concentration of warehouse space in specific locations to essentially render the shipping requirement meaningless, (iii) allowed "netting" of

25

incoming shipments which encouraged "shuttling" of shipments between warehouses (e.g., a shipment from one of Pacorini's warehouses directly to another would count against the daily quota), and (iv) applied to all metals in the aggregate and minimums were not applied to particular metals.

102.    In practice, Defendants treated the LME minimums as maximums, which was not a violation of the requirement and was done with the ongoing knowledge and consent of the LME.   Moreover, the "netting" and "shuttling" of shipments allowed Defendants to shuffle metals between their facilities, thereby facially meeting the LME's minimum release requirements without actually releasing commodities from warehouse storage into the market.

103.    The Defendants leveraged the new release requirement to extract increased storage rates from the LME.   Specifically, in exchange for Defendants' agreement to increase the daily minimum release requirement from 1,500 tons to 3,000 tons, the LME agreed to corresponding increases in storage rates.

104.    The pretextual rationale given to customers by the LME for the increases in rent at LME warehouses was that increases in minimum shipping requirements would lessen demand for storage and thus increases in storage price by weight were justified.[37]   Defendants knew, however, that storage times would not in fact decrease but would increase as they have done throughout the Class Period.   The delays occurred despite the Defendants having the ability to locate and release specific lots of metals very quickly.

105.    According to a report in October of 2013:

"[W]hen it comes to LME zinc stocks, New Orleans is pretty much the only game in town.   And the biggest player in town is Pacorini, owned by Glencore Xstrata, which has 34 of the 56 registered warehouses in New Orleans.   Metro (Goldman Sachs) has 15 and

---

[37] See Maytaal Angel, *Banks outsmart metals storage rules to make millions*, REUTERS (Feb. 6, 2012), http://www.reuters.com/article/2012/02/06/lme-warehouses-idUSL5E8D62DU20120206 (last visited June 12, 2014) ("new rules were expected to dent queues… [but] warehouses [were] able to hike rents in response.").

Henry Bath (JP Morgan) has five.  It's probable that only those three have any detailed insight into the exact nature of the zinc movements in the city.

But it is pretty clear that there is something of a merry-go-round at work with long periods of daily draws broken by the odd heavy-volume warranting days.  The last one prior to this week was Sept. 30, when 60,675 tonnes were warranted.  And the one before that was July 16, when 80,075 tonnes were warranted.  Whether this pattern reflects one operator raiding another for stocks or an operator shuffling metal to feed the queue or a bit of both is impossible to say. Stocks financing is definitely in the mix but it is more the mechanism for keeping the merry-go-round turning than the primary driver.

More important than who is doing what to whom is the simple fact that zinc stocks movements at New Orleans offer little if any insight into the state of the market. In times gone by the long periods of daily draws would have been a bullish indicator that consumers were tapping "the market of last resort." These days they signal merely the latest turn of the carousel.[38]

106.    Intended as a market of "last resort," meaning the industry can use the warehouse to sell excess stock in time of oversupply and a source of material in times of extreme shortage, LME warehouses have become a market of "first resort" or the "go-to market" in which the industry, producers, consumers, traders, merchants and banks, use as an alternative physical market. Using LME warehouses as a system of first resort has caused the system to back up "like a funnel" where market participants "dump large amounts of metal in the front end and only get a little out the back end." According to David Wilson, director of metal research at Société Générale SA, "it enables a situation where the rules of the warehousing system are taken advantage of."

107.    Non-existent or ineffective rules made by the LME, with input from Defendants as members of LME rule-making committees, during the Class Period contributed to Defendants' ability to effectively manipulate LME warehousing to their benefit.

108.    In May 2011, in response to industry complaints, the LME hired Europe Economics to assess the chorus of purchaser complaints regarding warehouse delays.  The

---

[38]    Andy Home, *Zinc: why the stocks don't work anymore*, REUTERS (Oct. 17, 2013), https://uk.finance.yahoo.com/news/column-zinc-why-stocks-dont-154339991.html (last visited June 12, 2014).

Europe Economics report contained a number of policy recommendations, including that the implementation of rent rebates for material that is "stranded" in a queue should be the subject of further discussion.   Citing only "feasibility issues," the LME refused to adopt the recommendation *to even discuss the issue*.   They did not publish the full report, citing "proprietary information."[39]

109.   Other proposals to alleviate backlogs and premiums have included that a warehouse may not charge rent once metals have been purchased, no matter how long it takes to extract the metals.  "But a change like that would hit the LME itself as it receives about 1 percent of the rental income earned by the warehouses it approves."[40]  Prior to Defendants taking over LME zinc warehousing, zinc stocks had been slightly over 300 million tons in 2009, but ballooned by July 2012, to 17-year highs.[41]  Zinc stocks went on to exceed 1.2 billion tons by 2013.

110.   As reported by the FINANCIAL TIMES, "The increase in exchange stocks will be a boon for warehousing companies, whose revenues depend on the amount of metal they store. But it will also fuel concerns among zinc users that the metal could suffer from the same long queues to take deliveries of the metal from the exchange that have bedevilled the aluminium industry."[42]

---

[39] *See Warehousing Studies*, LONDON METAL EXCHANGE, http://www.lme.com/en-gb/trading/warehousing-and-brands/warehousing/warehousing-studies/ (last visited June 12, 2014).

[40] *See* Pratima Desai et al., *Goldman's New Money Machine: Warehouses*, REUTERS.COM (July 29, 2011), http://www.reuters.com/article/2011/07/29/us-lme-warehousing-idUSTRE76R3YZ20110729 (last visited June 12, 2014).

[41] *See* Jack Farchy, *Zinc stocks jump to 17-year highs*, FINANCIAL TIMES (July 18, 2012), http://www.ft.com/intl/cms/s/0/a2c4663c-d0fb-11e1-8a3c-00144feabdc0.html (last visited June 12, 2014).

[42] *Id*

## 2.   Illicit incentive agreements

111.   During the Class Period, Defendants provided financial incentives to metals producers and traders to store zinc and other metals in their warehouses.[43] The incentives led to Defendants amassing stockpiles of metals in LME facilities.[44] Indeed, "[z]inc ... has been hit by long backlogs at LME warehouses due to LME rules that allow warehouse operators to release much less material per day than they take in. The lack of readily available metal has boosted premiums - the amount paid over the LME cash price for physical metal."[45]

112.   During the Class Period, both Pacorini and Metro paid incentives to market participants to store zinc in backlogged LME warehouses. Specifically, Glencore paid incentives exceeding the price premium that zinc producers could obtain by selling on the open market.[46]

113.   According to one report:

> [M]arket sources reported that warehouses including Metro and Pacorini have been courting US producers to bring zinc directly into LME stores. . . . In certain locations such as Detroit or New Orleans, offering that premium is affordable because stocks are so high there and they'll recoup the premium outlay on the rent, the second source said. . . . Pacorini has also reportedly approached US producers to deliver metal into stores in recent weeks, the first source said. I've heard that Pacorini is working an angle on some US producers. If they wanted to avoid the controversy of locking away more aluminium from the market, they would probably go for zinc, he said.[47]

---

[43] *See* Tatyana Shumsky & Andrea Hotter, *Wall Street Gets Eyed in Metal Squeeze*, THE WALL STREET JOURNAL (June 17, 2011) http://online.wsj.com/news/articles/SB10001424052702304186404576389680225394642 (last visited June 12, 2014); *see also*, Andy Home, Playing the new LME warehousing game, REUTERS (April 8, 2013) (discussing copper warehousing incentives), http://www.reuters.com/assets/print?aid=USL5N0CV1MY20130408 (last visited June 12, 2014).

[44] *See* NYTimes Report.

[45] *See* Eric Onstad, *Scramble for zinc finance deals drives sharp drop in stocks*, CHICAGO TRIBUNE (May 13, 2013), http://articles.chicagotribune.com/2013-05-13/news/sns-rt-zinc-inventoriesl6n0du260-20130513_1_zinc-study-group-lme-london-metal-exchange. (last visited June 12, 2014).

[46] *Zinc the new aluminium for warehouses, financiers*, Metal Bulletin (July 4, 2011).

[47] *Id.*

114.   These incentive payments caused the inflation of zinc premiums including the Platts zinc premium.

115.   Additionally, zinc is attracted to warehouses controlled by the Defendants by incentives on storage lease renewals or "rewarrants."[48]

### 3.   Glencore's Domination of the Zinc Market

116.   Not only did the Defendants dominate LME warehousing through their acquisitions at the beginning of the Class Period, they also actively traded in zinc warehoused in the LME system.  With respect to the zinc market, no player was or is as dominant as Glencore.

117.   Glencore trades physical zinc and zinc derivatives, smelts and refines zinc, and mines and produces zinc.  Glencore trades 60% of the world's zinc, and owns and controls 35% the output of the world's zinc mines.  Glencore also maintains "off take" agreements with miners under which it has exclusive rights to sell a zinc mine's output.[49]

118.   Glencore maintains an agreement with Nyrstar - the only primary zinc producer in the United States - to market its zinc output by which Glencore effectively sells 100% of the primary zinc produced in the United States.[50]

119.   Moreover, Glencore has reported that it produced 35% of the world's mined zinc in 2013.[51]

---

[48] When an LME forward contract matures, delivery of "warrants" for metal in a LME warehouse must be made by sellers who have not liquidated (i.e., traded out of their contract) to buyers who have not liquidated.  A warrant is the document of title to metal stored in an LME certified warehouse.   It takes the form of centrally-maintained electronic records under the LME's electronic records system.  Each warrant represents a specific physical lot; a specific non-interchangeable tonnage and brand.  In order to maintain the warrant system ("rewarrant"), the LME certifies and makes agreements with warehouse owners to store zinc, including agreements with the Defendants.

[49] *See, e.g., Nyrstar Extends Commodity Off-take Agreement with the Glencore Group*, Nyrstar Press Release (June 27, 2011), http://www.nyrstar.com/investors/en/news/Pages/1526100.aspx. (last visited June 13, 2014).

[50] United States Department of the Interior, U.S. Geological Survey, Zinc [Advance Release] Primary—2011 Minerals Yearbook (Feb. 2012), http://minerals.usgs.gov/minerals/pubs/commodity/zinc/myb1-2011-zinc.pdf ("Nyrstar's Clarksville electrolytic zinc refinery was the only primary zinc smelter in the United States.") (last visited June 13, 2014).

120.    Glencore's dominance in the zinc market was further enhanced by its merger with Xstrata—a leading mining company—during the Class Period.  Industry groups were concerned that the merger with Xstrata would mean that Glencore would be "effectively controlling the zinc supply chain from mining to warehousing operations. . . .  Glencore/Xstrata can still exert controlling influence on the zinc market, for instance by artificially shortening supplies."[52]

121.    "For industry watchers, the value of mined zinc production is itself impressive, however the combination of a very strong mining company with the world's largest commodity trader, which already has its own production facilities and off-take agreements, is what is really striking."[53]

122.    And while the interests of metal producers like Glencore can and do run counter to the interests of metals traders (in a normal competitive market), playing both sides of the table in a highly concentrated industry yields big dividends.  "While taking a short position might go against Glencore's position as a producer, it is also known as a canny trader.  'If Glencore's trading business was of the view that market dynamics were likely to drive prices for a commodity down, they might well look to trade on that in order to profit from it. That's a cultural difference between Glencore and many other (mining) companies,' an industry source said.  The short position might dovetail with some of their positions in other areas of the production chain,

---

[51] Glencore Presentation Sides, 2014 Global Metals, Mining &Steel Conference, Bank of America May 13, 2014 Merrill Lynch (May 13, 2014), at http://www.glencore.com/assets/Uploads/speeches_and_presentations/glencore/2014/20140513-Glencore-BAML-conference-Miami.pdf.  (last visited June 13, 2014).

[52]    *EUROFER:    Concerns    about    Glencore/Xstrata    remain*, http://www.eurofer.org/#/News%26Media/Press%20releases/Concern%20about%20Glencore_Xstrata.fhtml.   (last visited June 13, 2014).

[53]  Company Announcement: Glencore-Xstrata to hold 11% of global zinc market (Oct. 8, 2012), http://www.miningweekly.com/print-version/company-announcement-glencore-xstrata-to-hold-11-of-global-zinc-market-2012-10-08. (last visited June 13, 2014).

another source said. 'They have such a substantial position in the zinc markets so they have many options.'"[54]

### 4.    Market Allocation

123.    The constrained supply artificially increased, *inter alia*, premiums relating to zinc because as warehouse queues lengthened, storage fees compounded and drove up the cost of sourcing zinc out of LME warehouses. These costs are factored into market premiums, including for transactions outside the LME system since the LME is the supplier of last resort. As detailed in Section VIII, *infra*, premiums for zinc rose sharply during the Class Period.

124.    Five locations are reported to be the centers of the delay and important to Defendants' scheme. These are reported to be Detroit, New Orleans, Antwerp, Vlissingen and Johor.[55]

125.    Delays in these warehousing markets are significant because of their large size (*i.e.* large number of warehouses subject to aggregate load-out rules).[56]

126.    As noted recently, "trader-warehouses can tweak the matrix at any time either by sucking in more metal from the physical market via incentives or by building out existing queues by cancelling their own metal."[57]

127.    The Defendants dominate each of these locations: the Defendants own 54 of 56 LME approved warehouses in New Orleans; Pacorini owns 55 of 60 LME approved warehouses

---

[54] Eric Onstad, *Half-mln tonne zinc position sparks jitters about hidden stocks*, REUTERS (Mar. 14, 2014), http://www.reuters.com/article/2014/03/14/metals-zinc-idUSL6N0M82G420140314. (last visited June 12, 2014).

[55] *See* Maria Kolesnikova & Agnieszka Troszkiewicz, *LME Seeks to Shorten 100-Day Withdrawal Times at Warehouses*, BLOOMBERG (July 1, 2013), http://www.bloomberg.com/news/2013-07-01/lme-seeks-to-reduce-lines-at-warehouses-where-wait-is-100-days.html. (last visited June 12, 2014).

[56] *Id.*

[57] *See* Andy Home, *Playing the new LME warehousing game*, REUTERS (April 8, 2013), http://www.reuters.com/assets/print?aid=USL5N0CV1MY20130408 (last visited June 12, 2014).

in Vlissingen; Metro dominates warehousing in Detroit; and Defendants own 15 of 20 LME approved warehouses in Johor.[58]

128.    In 2013, reports indicated that "[t]he warehouse logjam ... extends to copper, zinc and aluminum, where stocks in Vlissingen have all jumped since mid-May and are now backlogged." [59]

129.    In Antwerp, where warehousing is largely controlled by Trafigura, zinc stocks in Antwerp jumped from zero to over 150,000 tonnes over a roughly two-week period in October 2012.[60]

130.    In New Orleans, where Defendants control LME zinc warehousing (in 2012, there were 59 warehouses approved by the LME to store metals in New Orleans: Glencore owns 28 of them; Goldman has 22; JPMorgan has four; and Trafigura has three).[61]

### 5.    Off Warrant Warehouses

131.    Defendants may have also manipulated zinc prices by moving metals on and off warrant to disrupt market perceptions of the availability of metals.

132.    It was recently reported that "Trafigura's warehousing and logistics subsidiary has delisted eight metals warehouses in Antwerp, Belgium ... as the market prepares for tighter

---

[58] *See London Metal Exchange: Approved warehouses*, LONDON METAL EXCHANGE, http://www.lme.com/trading/warehousing-and-brands/warehousing/approved-warehouses/ (last visited June 12, 2014).

[59] *See* Maytaal Angel, *Storage play by Glencore, Trafigura pushes up lead costs*, REUTERS (Sept. 18, 2013), http://uk.reuters.com/article/2012/09/18/uk-glencore-lead-idUKBRE88H0L420120918 (last visited June 12, 2014).

[60] *See Trafigura becomes latest to profit from metals storage queues*, REUTERS (Nov. 16, 2012) http://www.reuters.com/article/2012/11/16/metals-warehousing-trafigura-idUSL5E8MGAZT20121116. (last visited June 12, 2014).

[61] By October 2013, Glencore further consolidated its ownership of New Orleans area LME warehouses. *See Zinc: why the stocks don't work anymore*, REUTERS (Oct. 17, 2013), at https://uk.finance.yahoo.com/news/column-zinc-why-stocks-dont-154339991.html. (last visited June 13, 2014).

33

LME rules to reduce wait times to access metal in warehouses following complaints, lawsuits and regulatory pressure."[62]

133.    Similarly, a recent report that Glencore's Pacorini warehouse subsidiary has de-listed 14 LME-approved metals warehouses in Vlissingen is not a sign that the firm is moving out of warehousing, but merely that it is positioning itself to store metal off-warrant, increasing the scope for the firm's involvement in LME metals warehousing manipulation.[63]

134.    Following the massive buildup in late 2012, "[t]he quantity of LME metals stored at Antwerp has shrunk by more than 40 percent to less than 200,000 tonnes since July 1, when the LME released initial proposals regarding its warehouse regulations."[64]

135.    These reports suggest that as profitable warehousing queue buildups are being challenged, Defendants may be seeking a way to manipulate perceived availability of zinc to move underlying prices.

## VI.    INVESTIGATIONS

### A.    Government investigations and the Sale of the LME

136.    Defendants' scheme has attracted significant governmental and regulatory scrutiny.  For instance, in November 2012, *Reuters* announced that the European Commission ("EC") had initiated a review of LME metals warehousing conduct and agreements alleged

---

[62]  *Trafigura's Impala delists 8 metals warehouses in Antwerp*, REUTERS  (Feb 11, 2014), http://www.metal.com/newscontent/57344_trafiguras-impala-delists-8-metals-warehouses-in-antwerp  (last  visited June 12, 2014).

[63]  *Glencore Will Slide Into Wall Street Banks' Commodities Space*, Metal Miner (Feb. 14, 2004), at http://agmetalminer.com/2014/02/14/glencore-will-slide-into-wall-street-banks-commodities-space/  (last  visited June 13, 2014).

[64]  *Trafigura's Impala delists 8 metals warehouses in Antwerp*, REUTERS  (Feb 11, 2014), http://www.metal.com/newscontent/57344_trafiguras-impala-delists-8-metals-warehouses-in-antwerp  (last  visited June 12, 2014).

herein and contacted the LME.[65]   More recently, in November 2013, the British Parliament's Treasury Select committee urged the UK's Financial Conduct Authority to investigate potential abuses in the metals market generally.[66]

137.    The Commodity Futures Trading Commission has also initiated a review and has asked companies to "retain, preserve, and safeguard against destruction all documents, communications, and other information and materials" concerning or relating to *any warehouses that store physical metals* against a futures contract, according to a letter, dated July 18, 2013 and mailed from the division of enforcement's Chicago office.[67]

138.    On July 23, 2013, the Senate Banking Committee held hearings on the role of financial institutions in commodities markets.  The hearings dealt with the inherent conflicts of interest involved with financial institutions holding large stakes in physical commodities. [68]

139.    The LME was sold in December 2012 to the HKEx in a deal in which Goldman and JPMorgan divested their combined roughly 20% ownership of the LME, earning an estimated $436 million combined from the sale

140.    Then, in August 2013, it was reported that Goldman and JPMorgan were seeking to sell their commodities assets, including warehouses.

---

[65] *See* Agnieszka Troszkiewicz, *EU Plans to Discuss Metal Premiums and LME Warehouse 'Issue,'* BLOOMBERG (Nov. 9, 2012),   http://www.bloomberg.com/news/2012-11-09/eu-plans-to-discuss-metal-premiums-and-lme-warehouse-issue-1-.html. (last visited June 12, 2014).

[66] *See* Patrick Jenkins & Jack Farchy, *Regulators urged to probe metals markets abuse*, FINANCIAL TIMES (Nov. 10, 2013) ("the UK's Financial Conduct Authority... said it would continue to monitor the LME's progress in increasing the transparency of its market.").

[67] *See* Agnieszka Troszkiewicz, *CFTC's Chilton Says 'Thoughtful Review' of Warehouses Needed*, BLOOMBERG (July 22, 2013) http://www.bloomberg.com/news/2013-07-22/cftc-says-thoughtful-review-of-warehousing-needed-1-.html. (last visited June 12, 2014).

[68] *See, e.g., Hearing on Examining Financial Holdings Companies: Should Banks Control power Plants, Warehouses and Oil Refineries?*: Hearing Before the S. Comm. on Banking, Housing, & Urban Affairs, Subcommittee on Fin. Insts. & Consumer Prot. 113th Cong. 5 (2013) (statement of Tim Weiner, Global Risk Manager, Commodities/Metals, MillerCoors LLC) ("Weiner Testimony").

141.    In addition, the LME is undergoing a legal review of the parameters for potential action it could take in regulating the incentives that warehouse companies can pay to attract metal into their facilities. According to the new owners of the exchange, these incentives have played a large role in creating bottlenecks.

142.    Additional investigations are opening.   For example, the U.S. Department of Justice (the "DOJ") opened an investigation in 2013 into allegations of anti-competitive warehousing agreements among Defendants that have been used to artificially inflate the cost of storing metals traded through the LME.[69]

143.    On January 14, 2014, the Federal Reserve (the "Fed") announced that it would consider further restrictions on banks' trading and warehousing of physical commodities.   The Fed's announcement came one day before the Senate Banking Subcommittee on Financial Institutions and Consumer Protection held a hearing titled "Regulating Financial Holding Companies and Physical Commodities," the second Senate hearing investigating ownership of metals warehouses by banks and holding companies and their relationship with the LME. Several Senators on the Banking Committee sharply criticized the Fed's proposal as "a timid step [that was] too slow in coming" and noted that "there is still too much that we do not know about these activities and investments [by the banks]."[70]

---

[69] See Devlin Barrett, *U.S. Opens Probe Into Metals Warehousing*, THE WALL STREET JOURNAL (Jul. 25, 2014), http://online.wsj.com/news/articles/SB10001424127887323610704578626861852665092 (last visited June 12, 2014).

[70] See Cheyenne Hopkins, *Senators Question Fed's Review of U.S. Banks' Commodities Units*, BLOOMBERG (Jan. 16, 2014), http://www.bloomberg.com/news/2014-01-16/senators-question-fed-s-review-of-u-s-banks-commodities-units.html. (last visited June 12, 2014).

## VII.   ECONOMIC EVIDENCE SUGGESTS MANIPULATION

### A.   Price effects

144.   "Zinc… has been hit by long backlogs at LME warehouses due to LME rules that allow warehouse operators to release much less material per day than they take in.  The lack of readily available metal has boosted premiums - the amount paid over the LME cash price for physical metal."[71]

145.   Reports in 2013 indicated that "[t]he warehouse logjam … extends to copper, zinc and aluminum, where stocks in Vlissingen have all jumped since mid-May and are now backlogged." [72]

146.   "Analysts say that some zinc is probably shifting from one warehouse operator to another due to competition to secure lucrative rents and also to maintain high physical premiums."[73]

147.   LME data showed in October of 2012 that 708,600 tonnes of zinc, equivalent to 71% of total LME warehouse stocks of the metal, is stored in New Orleans, almost entirely by Defendants.  According to one trader in late 2012, "[t]he zinc and aluminium cancellations are being carried out on what appears to be a friendly basis by two warehousing firms in particular, creating a queue for material and allowing the market to be bid as a result."[74]

---

[71] *See* Eric Onstad, *Scramble for zinc finance deals drives sharp drop in stocks*, CHICAGO TRIBUNE (May 13, 2013), http://articles.chicagotribune.com/2013-05-13/news/sns-rt-zinc-inventoriesl6n0du260-20130513_1_zinc-study-group-lme-london-metal-exchange. (last visited June 12, 2014).

[72] *See* Maytaal Angel, *Storage play by Glencore, Trafigura pushes up lead costs*, REUTERS (September 18, 2013), http://uk.reuters.com/article/2012/09/18/uk-glencore-lead-idUKBRE88H0L420120918 (last visited June 12, 2014).

[73] *See* Eric Onstad, *Scramble for zinc finance deals drives sharp drop in stocks*, CHICAGO TRIBUNE (May 13, 2013), http://articles.chicagotribune.com/2013-05-13/news/sns-rt-zinc-inventoriesl6n0du260-20130513_1_zinc-study-group-lme-london-metal-exchange (last visited June 12, 2014).

[74] Hotter, Andrea, *New Orleans warehouses offer incentives for copper as queues grow*, Metal Bulletin (October 5, 2012).

148. In fact, zinc premiums, have increased from $3.50/lb to approximately $9.25/lb between May 2010 and January 2014 (source: *Platts*):

| Date | Platts MW SHG Zinc Premium Weekly Data (cent/lb) |
|---|---|
| 20-May-10 | 3.50 |
| 21-May-10 | 3.50 |
| 27-May-10 | 3.85 |
| 28-May-10 | 3.85 |
| 3-Jun-10 | 4.00 |
| 4-Jun-10 | 4.00 |
| 10-Jun-10 | 4.00 |
| 11-Jun-10 | 4.00 |
| 17-Jun-10 | 4.00 |
| 18-Jun-10 | 4.00 |
| 24-Jun-10 | 4.00 |
| 25-Jun-10 | 4.00 |
| 30-Jun-10 | 4.25 |
| 1-Jul-10 | 4.25 |
| 2-Jul-10 | 4.25 |
| 8-Jul-10 | 4.25 |
| 9-Jul-10 | 4.25 |
| 15-Jul-10 | 4.25 |
| 16-Jul-10 | 4.25 |
| 22-Jul-10 | 4.25 |
| 23-Jul-10 | 4.25 |
| 29-Jul-10 | 4.25 |
| 30-Jul-10 | 4.25 |
| 5-Aug-10 | 4.25 |
| 6-Aug-10 | 4.25 |
| 12-Aug-10 | 4.75 |
| 13-Aug-10 | 4.75 |
| 19-Aug-10 | 4.75 |
| 20-Aug-10 | 4.75 |
| 26-Aug-10 | 4.75 |
| 27-Aug-10 | 4.75 |
| 31-Aug-10 | 4.75 |
| 2-Sep-10 | 4.75 |
| 3-Sep-10 | 4.75 |
| 9-Sep-10 | 4.75 |
| 10-Sep-10 | 4.75 |
| 16-Sep-10 | 4.75 |
| 17-Sep-10 | 4.75 |
| 23-Sep-10 | 4.75 |
| 24-Sep-10 | 4.75 |

| Date | Value |
|---|---|
| 30-Sep-10 | 4.75 |
| 1-Oct-10 | 4.75 |
| 7-Oct-10 | 4.75 |
| 8-Oct-10 | 4.75 |
| 14-Oct-10 | 4.75 |
| 15-Oct-10 | 4.75 |
| 21-Oct-10 | 4.75 |
| 22-Oct-10 | 4.75 |
| 28-Oct-10 | 4.75 |
| 29-Oct-10 | 4.75 |
| 4-Nov-10 | 5.00 |
| 5-Nov-10 | 5.00 |
| 11-Nov-10 | 5.00 |
| 12-Nov-10 | 5.00 |
| 18-Nov-10 | 5.00 |
| 19-Nov-10 | 5.00 |
| 24-Nov-10 | 5.00 |
| 26-Nov-10 | 5.00 |
| 30-Nov-10 | 5.00 |
| 2-Dec-10 | 5.00 |
| 3-Dec-10 | 5.00 |
| 9-Dec-10 | 5.00 |
| 10-Dec-10 | 5.00 |
| 16-Dec-10 | 5.00 |
| 17-Dec-10 | 5.00 |
| 22-Dec-10 | 5.00 |
| 24-Dec-10 | 5.00 |
| 30-Dec-10 | 5.00 |
| 31-Dec-10 | 5.00 |
| 6-Jan-11 | 5.00 |
| 7-Jan-11 | 5.00 |
| 13-Jan-11 | 5.00 |
| 14-Jan-11 | 5.00 |
| 20-Jan-11 | 5.00 |
| 21-Jan-11 | 5.00 |
| 27-Jan-11 | 5.00 |
| 28-Jan-11 | 5.00 |
| 31-Jan-11 | 5.00 |
| 3-Feb-11 | 5.00 |
| 4-Feb-11 | 5.00 |
| 10-Feb-11 | 5.00 |
| 11-Feb-11 | 5.00 |
| 17-Feb-11 | 5.25 |
| 18-Feb-11 | 5.25 |
| 24-Feb-11 | 5.50 |
| 25-Feb-11 | 5.50 |
| 3-Mar-11 | 5.50 |
| 4-Mar-11 | 5.50 |
| 10-Mar-11 | 5.50 |
| 11-Mar-11 | 5.50 |

39

| | |
|---|---|
| 17-Mar-11 | 6.00 |
| 18-Mar-11 | 6.00 |
| 24-Mar-11 | 6.00 |
| 25-Mar-11 | 6.00 |
| 31-Mar-11 | 6.00 |
| 1-Apr-11 | 6.00 |
| 7-Apr-11 | 6.25 |
| 8-Apr-11 | 6.25 |
| 14-Apr-11 | 6.50 |
| 15-Apr-11 | 6.50 |
| 20-Apr-11 | 6.50 |
| 21-Apr-11 | 6.50 |
| 28-Apr-11 | 6.50 |
| 5-May-11 | 6.50 |
| 6-May-11 | 6.50 |
| 12-May-11 | 6.50 |
| 13-May-11 | 6.50 |
| 19-May-11 | 6.50 |
| 20-May-11 | 6.50 |
| 26-May-11 | 7.00 |
| 27-May-11 | 7.00 |
| 2-Jun-11 | 7.00 |
| 3-Jun-11 | 7.00 |
| 9-Jun-11 | 7.00 |
| 10-Jun-11 | 7.00 |
| 16-Jun-11 | 7.00 |
| 17-Jun-11 | 7.00 |
| 23-Jun-11 | 7.50 |
| 24-Jun-11 | 7.50 |
| 30-Jun-11 | 7.50 |
| 7-Jul-11 | 7.50 |
| 14-Jul-11 | 7.50 |
| 21-Jul-11 | 7.50 |
| 28-Jul-11 | 7.50 |
| 4-Aug-11 | 7.50 |
| 11-Aug-11 | 7.50 |
| 18-Aug-11 | 7.50 |
| 25-Aug-11 | 7.50 |
| 1-Sep-11 | 7.50 |
| 8-Sep-11 | 7.50 |
| 15-Sep-11 | 7.50 |
| 22-Sep-11 | 7.50 |
| 29-Sep-11 | 7.50 |
| 6-Oct-11 | 7.50 |
| 13-Oct-11 | 7.50 |
| 20-Oct-11 | 7.50 |
| 27-Oct-11 | 7.50 |
| 3-Nov-11 | 7.50 |
| 10-Nov-11 | 7.50 |
| 11-Nov-11 | 7.50 |

| | |
|---|---|
| 17-Nov-11 | 7.50 |
| 23-Nov-11 | 7.50 |
| 30-Nov-11 | 7.50 |
| 1-Dec-11 | 7.50 |
| 8-Dec-11 | 7.50 |
| 15-Dec-11 | 7.50 |
| 22-Dec-11 | 7.50 |
| 29-Dec-11 | 7.00 |
| 5-Jan-12 | 7.00 |
| 12-Jan-12 | 7.00 |
| 19-Jan-12 | 7.00 |
| 26-Jan-12 | 7.00 |
| 2-Feb-12 | 7.00 |
| 9-Feb-12 | 7.25 |
| 10-Feb-12 | 7.25 |
| 16-Feb-12 | 7.25 |
| 23-Feb-12 | 7.25 |
| 29-Feb-12 | 7.25 |
| 1-Mar-12 | 7.25 |
| 8-Mar-12 | 7.25 |
| 9-Mar-12 | 7.25 |
| 15-Mar-12 | 7.25 |
| 22-Mar-12 | 7.25 |
| 29-Mar-12 | 7.25 |
| 4-Apr-12 | 7.25 |
| 12-Apr-12 | 7.25 |
| 19-Apr-12 | 7.25 |
| 26-Apr-12 | 7.25 |
| 3-May-12 | 7.25 |
| 10-May-12 | 7.25 |
| 17-May-12 | 7.25 |
| 24-May-12 | 7.25 |
| 25-May-12 | 7.25 |
| 31-May-12 | 7.25 |
| 7-Jun-12 | 7.25 |
| 14-Jun-12 | 7.25 |
| 21-Jun-12 | 7.25 |
| 28-Jun-12 | 7.25 |
| 5-Jul-12 | 7.25 |
| 12-Jul-12 | 7.25 |
| 19-Jul-12 | 7.25 |
| 26-Jul-12 | 7.50 |
| 2-Aug-12 | 7.50 |
| 9-Aug-12 | 7.50 |
| 16-Aug-12 | 7.50 |
| 23-Aug-12 | 7.50 |
| 30-Aug-12 | 7.50 |
| 6-Sep-12 | 7.50 |
| 13-Sep-12 | 7.50 |
| 20-Sep-12 | 7.50 |

| | |
|---|---|
| 27-Sep-12 | 7.50 |
| 4-Oct-12 | 7.50 |
| 11-Oct-12 | 7.50 |
| 18-Oct-12 | 7.50 |
| 25-Oct-12 | 7.50 |
| 1-Nov-12 | 7.50 |
| 8-Nov-12 | 7.50 |
| 15-Nov-12 | 7.50 |
| 21-Nov-12 | 7.50 |
| 29-Nov-12 | 7.50 |
| 6-Dec-12 | 7.50 |
| 13-Dec-12 | 7.50 |
| 20-Dec-12 | 7.50 |
| 27-Dec-12 | 7.50 |
| 3-Jan-13 | 7.50 |
| 10-Jan-13 | 8.00 |
| 17-Jan-13 | 8.00 |
| 24-Jan-13 | 8.00 |
| 31-Jan-13 | 8.50 |
| 7-Feb-13 | 8.50 |
| 14-Feb-13 | 8.50 |
| 21-Feb-13 | 8.50 |
| 28-Feb-13 | 8.50 |
| 7-Mar-13 | 8.50 |
| 14-Mar-13 | 8.50 |
| 21-Mar-13 | 8.50 |
| 28-Mar-13 | 8.50 |
| 4-Apr-13 | 8.50 |
| 11-Apr-13 | 8.50 |
| 18-Apr-13 | 9.00 |
| 25-Apr-13 | 9.00 |
| 2-May-13 | 9.00 |
| 9-May-13 | 9.00 |
| 16-May-13 | 9.00 |
| 23-May-13 | 9.00 |
| 30-May-13 | 9.00 |
| 6-Jun-13 | 9.00 |
| 13-Jun-13 | 9.00 |
| 20-Jun-13 | 9.00 |
| 27-Jun-13 | 9.00 |
| 3-Jul-13 | 9.00 |
| 11-Jul-13 | 9.00 |
| 18-Jul-13 | 9.00 |
| 25-Jul-13 | 9.00 |
| 31-Jul-13 | 9.00 |
| 1-Aug-13 | 9.25 |
| 8-Aug-13 | 9.25 |
| 15-Aug-13 | 9.25 |
| 22-Aug-13 | 9.25 |
| 29-Aug-13 | 9.25 |



| 5-Sep-13 | 9.25 |
| 12-Sep-13 | 9.25 |
| 19-Sep-13 | 9.25 |
| 26-Sep-13 | 9.25 |
| 3-Oct-13 | 9.25 |
| 10-Oct-13 | 9.25 |
| 17-Oct-13 | 9.25 |
| 24-Oct-13 | 9.25 |
| 31-Oct-13 | 9.25 |
| 7-Nov-13 | 9.25 |
| 14-Nov-13 | 9.25 |
| 21-Nov-13 | 9.25 |
| 27-Nov-13 | 9.25 |
| 5-Dec-13 | 9.25 |
| 12-Dec-13 | 9.25 |
| 19-Dec-13 | 9.25 |
| 26-Dec-13 | 9.25 |
| 2-Jan-14 | 9.25 |
| 9-Jan-14 | 9.25 |
| 16-Jan-14 | 9.25 |
| 23-Jan-14 | 9.25 |
| 30-Jan-14 | 9.25 |

149.    The increase has been dramatic:



150.    The large increase in the amount of zinc trapped in the Defendants' warehouses and the steady increases in premiums would not have occurred but for the artificial, anticompetitive effects of Defendants' agreements in unreasonable restraint of trade.

43

151.   By intentionally shifting both the demand curve and the supply curve for delivery of zinc, Defendants have increased premiums and thus the total price paid by purchasers of zinc for physical delivery in the United States.

152.   After the sale of the LME was completed in June 2012, Charles Li, the Chief Executive Officer of HKEx, stated, "If people have to wait a year, that's a very big problem; it is a level-one issue.  If somehow the LME system is making clients suffer in that way, that is not acceptable."[75]

**B.   Relevant product markets for assessing anticompetitive effects**

153.   The restraint of trade alleged herein directly inflated price, restricted supply, anti-competitively restrained the free alienability of zinc and otherwise constitutes a *per se* violation of Section 1.

154.   To the extent relevant, the relevant markets include, in the alternative, one or more of the following: (a) the market for warehousing zinc in the LME system; and (b) the market for trading zinc for physical delivery, including approval of warehouses for zinc which affected premiums and prices of the metals.  The LME has the power to control or agree to the terms and operations of its warehouses that hold zinc.  The geographical market for the foregoing markets is purchasers within the United States.

155.   Class members purchased zinc in the United States, including with attendant premiums, and Defendants have inflated prices in that market through anticompetitive conduct and agreements.

---

[75] Maytaal Angel & Susan Thomas, *Insight: Trade Houses Trump Banks in Metals Storage Play*, REUTERS (Oct.18, 2012),  http://www.reuters.com/article/2012/10/18/us-lme-warehousing-idUSBRE89H0EW20121018  (last visited June 12, 2014).

## VIII. ANTITRUST INJURY AND STANDING

156. Plaintiffs and members of the Class did in fact purchase zinc for physical delivery during the Class Period.

157. By their conspiracy to monopolize and otherwise restrain trade in zinc warehousing, Defendants did in fact directly, foreseeably, and proximately manipulate the price of zinc in the United States during the Class Period, which materially and proximately caused Plaintiffs and members of the Class injury to their business and property, within the meaning of Section 4 of the Clayton Antitrust Act.

158. Plaintiffs and members of the Class are threatened with impending future harm, within the meaning of Section 16 of the Clayton Act, if Defendants' continuing conspiracy is allowed to continue unabated.

## IX. CAUSES OF ACTION

### FIRST CAUSE OF ACTION:
### Section 1 of the Sherman Antitrust Act – All Defendants

159. Plaintiffs incorporate the preceding allegations by reference.

160. Defendants and unnamed conspirators entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1). Defendants' agreement to manipulate warehouse inventories and queues to directly, foreseeably, artificially and intentionally inflate premiums for zinc in the U.S. was a violation of the Sherman Act.

161. The conspiracy alleged herein is a per se violation of Section 1 of the Sherman Antitrust Act.

162. Alternatively, the conspiracy alleged herein is a rule of reason violation of Section 1 of the Sherman Antitrust Act.

163. Defendants intended to and actually did restrain trade. They shared a conscious commitment to a common scheme designed to achieve the unlawful objective of artificially fixing, depressing, raising, pegging, maintaining, stabilizing, and otherwise manipulating the supply of physical zinc available for delivery from LME warehouses. The restraint of trade in LME warehousing had the intended, direct, proximate and reasonably foreseeable effect of creating supra-competitive prices for zinc sold in the United States.

164. The conspiracy unreasonably restrained trade. There is no legitimate business justification for, or procompetitive benefits caused by, Defendants' unreasonable restraint of trade. Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

165. Plaintiffs and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

166. Plaintiffs and members of the Class are threatened with impending future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

### SECOND CAUSE OF ACTION:
### Section 2 of the Sherman Antitrust Act – All Defendants

167. Plaintiffs incorporate the preceding allegations by reference.

168. Defendants, by and through the LME, and, on information and belief, with each other have conspired to monopolize the market for LME zinc warehousing services in the United States.

46

169.   Defendants' contract, combination, and conspiracy in restraint of trade had the following effects, among others:

- Price competition in the zinc market has been restrained, suppressed and/or eliminated in the United States;

- Prices for zinc sold in the United States, including associated zinc premiums, have been fixed, raised, maintained and stabilized at artificially high, supra-competitive levels throughout the United States; and

- Plaintiffs and members of the Class have been deprived of the benefits of free and open competition.

170.   In furtherance of the unlawful conspiracy, Defendants and their co-conspirators have committed overt acts, including, *inter alia*:

- Defendants agreed to leverage inflated revenues to pay increased incentives to store zinc in their warehouses, enhancing market control and leading to additional price increases and delay;

- Defendants entered into an agreement establishing a shipping minimum on a per city rather than a per warehouse basis such that it was possible to concentrate warehousing in industrial centers, rendering the requirements ineffective and allowing backlogs and artificial cost increases;

- Defendants established minimum shipping requirements based upon an absolute number of tons rather than a more rational amount relative to warehouse capacity, or percentage of supply, thus it was possible to concentrate warehousing in industrial centers, rendering the requirements ineffective and allowing backlogs and artificial cost increases;

- Defendants established minimum shipping requirements based on gross numbers, which allowed "shuttling" of metals between warehouses to count toward the minimum, rendering the requirements ineffective and allowing backlogs and artificial cost increases;

- Defendants agreed to transform the minimum shipping requirement into maximums, rendering the requirements ineffective and allowing backlogs and artificial cost increases;

- Defendants agreed to a maximum shipping rate that was a small fraction of what should have been possible in an efficient market, rendering the requirements ineffective and allowing backlogs and artificial cost increases;

- Defendants agreed to cause a critical mass of metal to be built up at their LME warehouses which was used to influence zinc prices.

- Defendants agreed to unreasonably high storage rates and *quid pro quo* increases as compensation for decreased storage times that were purported to result from increased daily delivery requirements, but which were known by Defendants at the time to be illusory and made costs even higher;

- Defendants agreed, as a necessary, intended and direct effect, inextricably intertwined with their other conduct, to inflate prices for zinc in a market environment that should have dictated price movement in the opposite direction.

171.    The combination and conspiracy alleged herein has had the following effects, among others:

- Price competition in the sale of zinc has been restrained, suppressed, or eliminated;

- Prices and premiums for zinc have been fixed, raised, maintained, or stabilized at artificially high, non-competitive levels; and

- Plaintiffs and members of the Class have been deprived of the benefits of free and open competition.

172.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise or stabilize prices (including premiums) of zinc.  As a direct and proximate result of the illegal agreement, contract, combination, or conspiracy between Defendants, Plaintiffs and the members of the Class have been injured and damaged in their respective businesses and property.

173.    The conduct of Defendants and their co-conspirators constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Plaintiff and the Class seek damages and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not reoccur in the future.

174.     There is no legitimate business justification for, or procompetitive benefits caused by, Defendants' anticompetitive agreements and overt acts in furtherance thereof.    Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

175.     Plaintiffs and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

176.     Plaintiffs and members of the Class are threatened with impending future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

### THIRD CAUSE OF ACTION:
### Section 2 of the Sherman Antitrust Act - Glencore

177.     Plaintiffs incorporate the preceding allegations by reference.

178.     Glencore intentionally acquired and maintained monopoly power in the market for LME zinc warehousing services in the United States, or attempted to obtain a monopoly by anticompetitive means in the market for LME zinc warehousing services in the United States in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

179.     Glencore has monopoly power over LME zinc warehousing services in the United States, with a substantial majority of warehouses in New Orleans, where 50-70% of all LME licensed warehouses are located, including as much 80% or more of those located in the U.S. Glencore's anticompetitive conduct has caused substantial anticompetitive effects, including the inflation of the prices and price premiums of LME zinc to supracompetitive levels.

180.   To the extent Glencore did not or does not possess actual monopoly power, Glencore had or has a dangerous probably of success in maintaining monopoly power over ME zinc warehousing services in the United States.

## X.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a judgment against Defendants and in favor of Plaintiff and the Class and award the following relief:

A.   That this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as the representative of the Class and Plaintiff's counsel as counsel for the Class;

B.   That the conduct alleged herein be declared, adjudged and decreed to be unlawful;

D.   Compensatory, consequential, and general damages in an amount to be determined at trial;

E.   Costs and disbursements of the action;

F.   Restitution and/or disgorgement of Defendants' ill-gotten gains, and the imposition of an equitable constructive trust over all such amounts for the benefit of the Class;

G.   Pre- and post-judgment interest;

H.   Reasonable attorneys' fees;

I.   That Defendants be enjoined from the conduct challenged herein;

J.   Such monetary, injunctive or other relief pursuant to each Count alleged; and

K.   Such other and further relief as this Court may deem just and proper.

## XI.   DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and members of the proposed Class, respectfully demand a trial by jury on all issues so triable.

Dated: June 13, 2014                                        Respectfully submitted.

**BERNSTEIN LITOWITZ BERGER**
**  & GROSSMANN LLP**

Hannah Ross
1285 Avenue of the Americas
New York, New York  10019
Tel: (212) 554-1400
Fax: (212) 554-1444
Email: hannah@blbglaw.com

**KESSLER TOPAZ**
**  MELTZER & CHECK, LLP**
Joseph H. Meltzer
Kimberly A. Justice
Terence S. Ziegler
280 King of Prussia Road
Radnor, PA  19087
Tel: (610) 667-7706
Fax: (610) 667-7056
Email: jmeltzer@ktmc.com
Email: kjustice@ktmc.com
Email: tziegler@ktmc.com

**MATTINGLY & ROSELIUS, PLLC**
Jason E. Roselius
Jack Mattingly Jr.
13190 N. MacArthur Blvd.
Oklahoma City, OK 73143
Tel: (405) 603-2222
Fax: (405) 603-2250
Email: jason@mroklaw.com
Email: jackjr@mroklaw.com

**BRICKELL & ASSOCIATES, P.C.**
Bradley D. Brickell
1014 24th Ave N.W. Suite 100

51

Norman, OK 73069
Tel: (405) 360-0400
Fax: (405) 360-9990
Email: bbrickell@bradbrickell.com

*Attorneys for Plaintiffs and the Proposed Class*